Atlantic & Pacific Railroad Company, Respondent, *v.* City of St. Louis *et al.*, Appellants.

February 6, 1877.

1. The amended charter of the Pacific Railroad Company gave the right to construct a road "from the Mississippi River, or any point in the city of St. Louis," and its charter required that its roads should be commenced within seven years and completed within ten years thereafter. The com-

pany chose the point at which it would commence, and built its road westward from that point. *Held*, that, having maintained that location for twenty years, it could not then change its terminus; and that, having failed to build its branch roads within the time prescribed, it could not build a branch road to continue from its terminus eastward to the Mississippi River, nor treat a track laid between these points as a mere switching or spur track.

2. A public highway is the property of the people of the whole State, and may be disposed of by their representatives at their pleasure. The Legislature may authorize the building of a railroad over and along the streets of a city, but the city whose streets are thus taken may regulate and control the operation of such road within its limits.

3. Since the adoption of the Constitutions of 1865 and 1875, the Legislature of Missouri has no power to grant to an individual or corporation the right to construct or operate a railroad within any city without first obtaining the consent of the local authorities.

4. A railroad company cannot accept a license from a municipal corporation and operate its road thereunder, and then, after having delivered possession to its licensor treat it as a trespasser.

5. The parties to an action which was dismissed by plaintiff before final judgment are not concluded by the record therein.

APPEAL from St. Louis Circuit Court.

*Judgment reversed and injunction dissolved.*

*S. Reber*, for appellants, cited: 2 Dill. on Mun. Corp., 2d ed., 623, secs. 520, 521; Redf. on Rys., 3d ed., 391, sec. 105, p. 589, sec. 142 *et seq.;* Acts 1870, pp. 90, 91; Acts 1871, p. 66; 14 U. S. Stat. at Large, 292; McPheeters *v.* Meremac Bridge Co., 28 Mo. 465; People *v.* Duncan, 41 Cal. 507; Big. on Estop. 372, 384, 386, 387, 401, 412; Brooklyn Central R. R. Co. *v.* Brooklyn City R. R. Co., 32 Barb. 358; Pearcy *v.* Calais R. R. Co., 30 Me. 498; Acts 1863 (Adj. Sess.), 478.

*J. N. Litton*, for respondent, cited: Acts 1851, p. 268; Acts 1849, p. 219; Acts 1863, p. 478; Porter *v.* North Missouri R. R. Co., 33 Mo. 137; Lackland *v.* North Missouri R. R. Co., 34 Mo. 259; Presbury *v.* Old Colony, etc., R. R. Co., 103 Mass. 6; Slatten *v.* Des Moines R. R. Co., 29 Iowa, 153; Hatch *v.* Vermont Central R. R. Co., 25 Vt. 67; 2 Dill. on Mun. Corp. 622, secs. 519, 555–557, note 1; Hannibal & St. Joseph R. R. Co. *v.* Winder,

49 Mo. 165 ; Cleveland & Pittsburg R. R. Co., 56 Pa. St. 325 ; Black *v.* City of Philadelphia, 58 Pa. St. 252 ; Chicago, etc., R. R. Co. *v.* Wilson, 17 Ill. 123 ; Low *v.* Galena, etc., R. R. Co., 18 Ill. 324 ; Eldridge *v.* Smith, 34 Vt. 484 ; Protzman *v.* Indiana R. R. Co., 9 Ind. 469 ; Farmers' Loan & Trust Co. *v.* Curtis, 3 Seld. 470 ; Chouquette *v.* Barada, 33 Mo. 259 ; St. Louis Public Schools *v.* Risley, 28 Mo. 419 ; Jones *v.* Dana, 24 Barb. 398 ; Martindale *v.* Kansas City, etc., R. R. Co., 60 Mo. 510 ; City *v.* Shields, 60 Mo. 251, 252 ; Land *v.* Coffman, 50 Mo. 255 ; Ang. & Ames on Corp., sec. 224 ; Koehler *v.* Black, 2 Black, 717 ; Lovett *v.* Steam Saw-mill Assn., 6 Paige, 60 ; Taggart *v.* West Maryland R. R. Co., 24 Md. 596 ; Cooley's Const. Lim. 252 ; City of Lexington, 14 Wall. 296 ; Bissell *v.* City of Jefferson, 24 How. 287.

BAKEWELL, J., delivered the opinion of the court.

This was a proceeding to enjoin and restrain the city of St. Louis, the mayor, and the city engineer from tearing up a railroad track on Poplar Street, between Ninth Street and the Levee, in St. Louis, and from interfering with the use of the track by respondent for the purpose of its business as a railroad corporation carrying freight and passengers for hire.

It appears from the pleadings and evidence that the Pacific Railroad Company, in 1849, under a charter from the State, began constructing a railroad-track, from a point in the city of St. Louis a few hundred feet west of Seventh Street, to Franklin, west. The depot and terminus of the road was on the west side of Seventh Street, and remained at that point until July, 1870. On April 9, 1870, the Pacific Railroad Company petitioned the City Council of St. Louis for permission to extend its track eastwardly along Poplar Street to the Levee, so as to connect with the track of the North Missouri Railroad at that point, and have access to the grain elevator and the river. It asked that this privilege be granted to it on these conditions : that the

railroad would be responsible for all damages caused by moving of trains; that the privilege should expire on January 1, 1872; and the Council should impose such restrictions as public and private interests might require. In consequence of this petition the City Council passed ordinance 7329, on July 8, 1870, authorizing the Pacific Railroad Company to lay a single track on Poplar Street, from Ninth Street to the Levee, and along the Levee to the elevator, under the supervision of the city engineer, in such a manner as not to obstruct the use of the street for general purposes; the Pacific Railroad Company first to execute a bond for $250,000, conditioned to pay all damages to any person injured by the construction, maintenance, or operation of the road over this new track, and to save the city harmless. The terms were accepted, the bond executed, and the track laid. It was further agreed that if the railroad company did not take up the track by January 1, 1872, and restore the street to its former condition, the city engineer should do this at the expense of the railroad company. On January 26, 1872, at the request of the railroad company, an ordinance, No. 7897, was passed, extending these privileges to January 1, 1873, a bond to be executed by the road, conditioned as before. On February 20, 1872, the Pacific Railroad Company declined to accept the provisions of the new ordinance, and notified the city of that fact, and tore up its track between Eighth and Ninth Streets, at the Fifth Street crossing, and near the elevator, leaving breaks of several feet at these three points. The track remained in this condition for some weeks, when the Pacific Railroad Company relaid the track at the points at which it had taken up the rails in accordance with a resolution of the board of trustees of February 10, 1872. On March 27, 1872, the city commenced suit against the Pacific Railroad Company, to restrain it from maintaining and operating this track on Poplar Street, on the ground that it was a dangerous nuisance; an answer and reply were filed, but the cause was never

tried, br* w*s dismissed by the city.   On June 29, 1872, a lease was executed by the Pacific Railroad Company to respondent, by which respondent claims to have acquired all the franchises of that road, and under which it took possession of the property of the Pacific Railroad Company, and operated one continuous road from St. Louis to the Indian Territory, and used the Poplar Street track.

In July, 1873, the City Council of St. Louis, by ordinance, declared the use and occupation of Poplar Street by respondent, and the track on that street, a public nuisance, and forbade its use, and required respondent to take it up, failing which, the ordinance directs its removal by the city engineer, under the direction of the mayor.   In obedience to this ordinance the city engineer, by direction of the mayor, tore up the track, which was at once relaid by respondent; and on August 13, 1873, respondent instituted this suit.

It is claimed by respondent that the extension of the road from Ninth Street east was not made under ordinance 7329, which granted, respondent says, no privileges, but was a simple recognition, on the part of the city, of the rights of respondent derived from legislative enactments independent of the ordinance.

There was evidence tending to show that the track along Poplar Street destroyed the use of the street for any purpose of business.   There was also evidence tending to show that the track was badly constructed and badly kept, and that trains passed over it at all hours at a dangerous rate of speed; that its use was a constant source of danger, and rendered the houses on Poplar Street unsafe and untenantable by the concussion.   There was also evidence tending to show that the track was well laid and well kept, and the trains carefully run, with proper watch at the crossings.   It was shown that Poplar Street was twenty-one feet wide from curb to curb; that the width of a locomotive-engine or of

an ordinary railroad-car is nine feet; that of a dray, seven feet ten inches; and that of an ordinary wagon, six feet nine inches.

The act of Congress of July 27, 1866, incorporating plaintiff, the act of the General Assembly of the State of Missouri of March 12, 1849, incorporating the Pacific Railroad Company, and the acts amendatory of and supplementary thereto, of March 1, 1851, and of February 24, 1853, were offered in evidence, as were many other private acts, and some documentary evidence. These, so far as may be necessary, will be set out or referred to in the course of this opinion.

There was an interlocutory decree for plaintiff, granting the prayer of the petition, with this modification, that in the use of its track it should not interfere with the enforcement of any lawful police regulation of the city. On final hearing the injunction was made perpetual. The defendants appeal to this court.

The right and duty of a municipal corporation, and especially of the city of St. Louis, to control the use of the public streets within its limits, to remove obstructions, and to protect the general public in its right to use the streets for the ordinary purposes of travel and commerce without unnecessary difficulty or danger cannot be called in question. In the absence of a license from some power authorized to grant it, no person has the right to lay down or maintain any railroad-track over any public highway, and if such a track is laid down or maintained by any individual or any corporation, without authority, it is the duty of the city to remove it and restore the street to the ordinary purposes of commerce. It was for the plaintiff, therefore, to show a clear right to maintain and operate this track at the date of the alleged trespass complained of in this action, and if it has failed to do so it was not entitled to judgment.

A highway is the property of the people, not of a particular district, but of the whole State, who, constituting as

they do the legitimate sovereign, may dispose of it by their representatives, and at their pleasure. Highways, therefore, being universally the property of the State, are subject to its absolute direction and control. Streets in incorporated cities, and other public highways, are all subject to the paramount authority of the Legislature in the regulation of their use. This is substantially what is said by Judge Gibson, in the case of the *Philadelphia & Trenton Railway Company*, 6 Whart. 44 (1840). In Pennsylvania, and in many of the States of the Union, it has been long held that the Legislature has the power to authorize the building of a railroad over and along a street, and this is also the English doctrine ; and, whilst it has been doubted by some grave authorities whether these modern improvements, however desirable, are not such material changes of a public easement, and the imposition of such a new servitude, as to demand that they should not be imposed without compensation to the owners of the land, and it was suggested in *Lackland* v. *North Missouri Railroad Company*, 31 Mo. 183, that a railroad in a city street is perhaps of itself such an obstruction to it as to amount to a total perversion of the street from its original purposes, and furnish ground to the property-holder for an action for damages, it has been subsequently held, and is now the law in this State *(Porter* v. *North Missouri R. R. Co.*, 33 Mo. 128), that the use by a railroad of a street, in its ordinary use as a means of travel, is not such a perversion of the highway from its original purpose as to entitle the abutters to an action for the injury done to them.

Resulting from the power over streets which is universally granted to them in their charters, and to protect the safety of citizens and their property, municipal corporations, in the absence of legislative restrictions, may control the mode of propelling cars within their limits, may entirely prohibit the use of steam-tractors, and may regulate the rates of speed. Dill. on Mun. Corp., sec. 565 ; 5 Hill, 209.

Special legislative authority is necessary to enable a company to construct a passenger railway in the street; and the Legislature, instead of directly granting to railroad companies the right to occupy streets, to build and operate their roads, may delegate the right to municipalities. But the ordinary powers to regulate streets are not sufficient to empower a municipal corporation to authorize the use of any street within its limits for the construction and operation of a street railway to be traversed by locomotives worked by steam. Dill. on Mun. Corp., secs. 559, 578.

The policy of this State was sufficiently declared nearly twenty-five years ago by an act of the General Assembly expressly prohibiting the use of steam as a means of locomotion on the streets of any city, without permission from the local authorities (Acts 1853, p. 185, sec. 28, par. 5); and, in 1865, a provision was inserted in the Constitution that "the General Assembly shall not pass any special law granting to any individual or corporation the right to lay down railroad-tracks in the streets of any city or town;" and, in 1875, a similar provision was adopted as part of the organic law of the State, the Constitution then adopted containing a clause that "no law shall be passed by the General Assembly granting the right to construct or operate a street railroad within any city, town, or village, or on any public highway, without first obtaining the consent of the local authorities having control of the street or highway proposed to be occupied by such street railroad, and the franchises so granted shall not be transferred without similar assent first obtained." Const. 1865, art. 4, sec. 27; Const. 1875, art 12, sec. 20.

Now, let us grant for a moment two propositions that are strenuously contested by the appellant: first, that the Pacific Railroad Company had a right to maintain and operate a track, during the year 1872, from Seventh Street east to the Levee, and thence to the elevator; and, second, that plaintiff was the lessee of the Pacific Railroad Company.

Plaintiff, as lessee of the Pacific Railroad Company, must of course be bound by all the prohibitions and limitations contained in the charter of the lessor, and, on the other hand, be held entitled to all its rights and franchises. The Pacific Railroad Company took a license to build this track from the city. It contends, it is true, that it was not bound to take such a license, and that it had a right under its charter to build this road; however, it did in fact apply for a license, and constructed this track and operated it for two years under that license. The terms, as appears from the petition in evidence, were suggested by itself, and they are eminently reasonable; they are mere police regulations, having reference to the comfort, welfare, and safety of society; and, conceding for the argument the right of the road, under its charter, to build and maintain this track, they do not seem to take away any essential privilege which its charter confers. The only provision which seems at all onerous is the provision for a bond; but, as, in spite of the license contained in the charter, both the city and the railroad might be held liable for any damage done by its locomotives on the street, it does not appear that this is matter for complaint. Now, the charter of the Pacific Railroad Company was a contract, and the Legislature cannot impair its obligations, but we think it may be a very grave question whether the regulations imposed by the city upon the Pacific road were any violation of the essential terms of the contract, and whether they were not such a legislative regulation of the exercise of the corporate franchise of the road as it was competent for the city to make by general laws passed for the peace, good order, and safety of the community. *Sloan* v. *Pacific R. R. Co.*, 61 Mo. 24; *Philadelphia R. R. Co.* v. *Bowers*, 4 Houst. (Del.) 506. Upon this question, however, it is not necessary for us to pass, and we are not to be understood as determining it. We think, on other grounds, that the Pacific Railroad Company

had not a right to construct and operate this track without the consent of the municipal authorities.

The constitutional provisions on this subject we have already set forth. They were not in force at the date of the original charter of the Pacific Railroad Company, nor at the date of the first amendment to the charter, under which last alone it can pretend to any right to enter the city ; although a similar legislative enactment, as we have said, was passed by the General Assembly very shortly after the charter of the Pacific road was granted. Rev. Stat. 1855, p. 426, sec. 29 ; Acts 1853, p. 185.

The Pacific Railroad Company was incorporated by an act approved March 12, 1849, which authorizes (sec. 7) the construction of the road " from the city of St. Louis to the city of Jefferson, thence to the western line of Van-Buren County, with the view that the same may be hereafter continued west to the Pacific Ocean." It is held that a location of a road " from " a city does not give leave to enter it. *Northeastern R. R. Co.* v. *Payne*, 8 Rich. 177. Section 7 provides that " said company may build said road along or across any county road, or the streets or wharves of any town or city." This plainly means any town or city which the road is authorized to enter, or through which it may pass. Section 12 provides that the building of the road shall be commenced within seven years and completed within ten years thereafter.

An amended act was, however, passed on March 1,. 1851, and this gives the right to enter St. Louis and pass through it from east to west. It says (sec. 9) that the road may be built " from the Mississippi River, or any point in the city of St. Louis, and may construct lateral or branch railroads to a point or points not exceeding fifty miles from the main line."

The Pacific Railroad Company having chosen the point in St. Louis at which it would commence, having fixed its depot at Seventh Street and laid its track west from that point,

and having maintained that location for twenty years, was, we think, concluded by what it had done, and could not then change its terminus. *Brooklyn Central R. R. Co.* v. *Brooklyn City R. R. Co.*, 32 Barb. 358 ; Pierce on Am. R. R. Law, 218 ; 1 Redf. on Rys. 390, sec. 105. It is, however, claimed that this track from Seventh Street east is a lateral road, and is built under the power to construct branch roads, and is a mere incident to the main road. It seems difficult to conceive that a road which is a mere prolongation of the main road, in a direct line, can be called a lateral or branch road, nevertheless it has been so held in Pennsylvania, in the case of *Mayor of Pittsburg* v. *Pennsylvania Railroad Company*, 48 Pa. St. 355. But the right to build branch roads must not be construed into a " roving commission," as is said in a Wisconsin case (*Attorney General* v. *West Wisconsin R. R. Co.*, 36 Wis. 466), to run throughout the city. Corporate franchises cannot be to this extent created by implication or extended by construction ; and it is expressly held that, where, by a provision in the charter of a road, the company was empowered to build lateral roads, and was required to complete its road within a certain time, after the time expired the right of constructing lateral roads was gone. *Morris & Essex R. R. Co.* v. *Central R. R. Co.*, 31 N. J. 207.

In support of the view that the Pacific Railroad Company could build this track under the branching power in its amended charter of incorporation we are referred to the case of *The State* ex rel. v. *St. Louis, Kansas City & Northern Railroad Company*, recently determined by this court. But an examination of that case will show that the right of the St. Louis, Kansas City & Northern Railroad Company to reach the Union Depot was put, not upon any right to build lateral roads, but upon the declared policy of the State in establishing a Union Depot.

The North Missouri Railroad Company, whose franchises the defendant in that case had acquired, was chartered on

March 3, 1851. It located its terminus at Biddle Street in St. Louis, and ran north. By its amended charter (Acts 1853, p. 326) it had power to construct lateral or branch roads, and was empowered to extend through St. Louis County and the northern counties, and was compelled to complete its road to the northern line of Schuyler County before 1862. It was also authorized to build its road "along or across any State or county road, or street or wharves of any town or city." Nevertheless it never pretended that it could, after the completion of the road, pass through and lay its tracks upon the streets of this city, or the roads of the county, without express license; but when, in obedience to the act establishing a union depot, it desired to connect with that depot, it, on July 6, 1875, petitioned for and obtained the right of way to pass through and along the necessary streets and highways; and it never seems to have conjectured that, by any possibility, it could be allowed to pass straight through the city to the depot by a continuation or prolongation of its main line from the Biddle Street terminus, but it made a side road, tapping its main line at Ferguson Station, ten miles from the city, and thus approached the depot from the west.

It is expressly said by this court in that opinion, on a precisely similar state of facts (for the North Missouri road had, as in the case at bar, a franchise to pass over the streets of the city, granted before the organic law required the city's consent), that the State, having established the Union Depot in St. Louis on the pledge that it expected to use it, having declared the policy of the State that all roads should center there, had, by the strongest and most necessary implication, given the necessary means to the end, and cleared away all obstacles; that it could not, however, commit a trespass to do this; that the streets of a populous city were in the way, *and the consent of the city necessary.* "Indeed," says the learned judge who recently adorned this bench, and who delivered the opinion of the court, "it is plain that, if the

Union Depot lies within the city, no connection with it can be effected, since the adoption of that organic law " (Const. 1865), " not approved by the city authorities. All this was known to the General Assembly of 1871."

It was contended in that case that the road could adopt no route to the Union Depot which did not pass through the Biddle Street terminus. It was conceded on all sides that it could not lay its new track on a street of the city without express permission, since the law of 1853 and the Constitution of 1865.

We are, however, told that the Pacific road could build and maintain this road under the act of the General Assembly of February 15, 1864, entitled " An act for the convenient delivery of railroad freight in the city of St. Louis," which authorizes the Missouri, Iron Mountain, and Pacific Railroad Companies to connect their lines one with another, and to lay switches to unload freight to the elevator, and for these purposes to lay a track on the Levee, and to condemn a right of way to the Levee, on condition that their tracks shall be passable for vehicles and always convenient for the passage of carriages, and shall not impede the street. But this act, so far as it conflicts with the Constitution of 1865, was repealed by it. The road on Poplar Street was not constructed under it. The Pacific Railroad Company never accepted its provisions. On the contrary, the company applied to the city for a license, and constructed this track and used it for two years under a license from the city ; and then applied for a renewal of the license, which it had no sooner obtained, by means of an ordinance passed at its special request, than it goes through the ceremony of tearing up a few feet of its track, declines the license it had petitioned for, stops its cars for a week or two, and then denies the title of its licensor, claims that it has disclaimed, and treats its licensor of a few days before as a trespasser for entering into the possession of the property which it says it had given up to her.

We are next told that this new track on Poplar Street is a mere switching track, siding, or turn-out, the power to build which is always given by implication to every railroad. But we do not think this road, which crosses seven busy streets on its way to the Levee, is a mere spur-track, built under the original charter.

Our attention is especially called to the act of March, 1869. Acts 1869, p. 74. But that law, if it could give any power to maintain a track without the consent of the city — which, for reasons given, it plainly could not — would not be in point, since it refers only to corporations created under the general statutes of 1865.

What has been said disposes of this case and makes it entirely unnecessary to inquire into the question as to whether or not the Pacific Railroad Company did, or could, legally convey its franchises to plaintiff. If the Pacific Railroad Company had no title to the track, and was a mere trespasser, it could convey no title to the plaintiff, for it had none to convey.

It is said, in the brief of counsel for respondent, that the question as to the authority of the Pacific Railroad Company to construct and maintain this track is *res adjudicata*, having been passed upon by the Circuit Court in the proceeding commenced by the city in March, 1872, against the Pacific Railroad Company, to restrain it from operating this track. But it appears from the record that that cause was dismissed before final judgment. It, therefore, determined nothing, and concluded nobody.

We have given to this cause that careful attention which the importance of the principles involved and the magnitude of the interests at stake seem to demand. That the road should be compelled to ask and obtain permission of the city to run to the Levee may seem hard ; but that a city of nearly half a million inhabitants should be cut in two in its very center, from its river-front to its western limits, by a railroad, over which cars are being drawn by steam at all

hours, day and night, so that no one can pass from north to south without risk, is also hard; and, if the city is not to be allowed to impose conditions, it seems intolerable. Seventh Street, Sixth, Fifth, Fourth, Third, and Second Streets, which this road thus cuts in two, are the busiest streets of this great metropolis, and swarming with life up to a late hour at night. If the Pacific Railroad Company had a contract with the State, entitling her to lay this track and maintain it, it might still be said that the city might well impose conditions prohibiting the drawing of cars by steam; and that, the Pacific Railroad Company having accepted the license from the city, and in consideration that the city waived, on its part, its strict right to prohibit the use of steam-locomotives across and along its most populous streets, and having abandoned any claim to build this road under its charter, and acknowledged and solemnly admitted that it built and maintained it by the sole leave and license of the city, it is now too late to claim rights which it has been induced by a valuable consideration to abandon. But we do not consider that the charter of the Pacific Railroad Company authorizes the construction of this new road; and any subsequent authorization which has been shown by this record is repealed by the Constitution of the State, so far as it ignores the right of consent on the part of the city.

We think, therefore, that the judgment of the Circuit Court should be reversed and the injunction dissolved, and it is so ordered. All the judges concur.